Filed 1/24/14  In re H.R. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re H.R. et al., Persons Coming Under the Juvenile Court Law. | B245934 (Los Angeles County Super. Ct. No. CK94113) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>J.M.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Dismissed.

Tyna Thall Orren, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent Department Of Children and Family Services.

Karen B. Stalter, under appointment by the Court of Appeal, for Minors.

A mother challenges the removal of her children from her custody and an order for supervised visitation. She argues the juvenile court should have appointed independent counsel for the children once a conflict arose as to the attorney jointly representing the children who made intermittently conflicting factual statements and expressed differing wishes. Mother also argues that the attorney ineffectively represented one of the children by focusing on one child and ignoring another's views. We will dismiss the appeal. Many of the issues mother raises are now moot; the remainder have been forfeited by virtue of her failure to raise them in the trial court.

## PROCEDURAL AND FACTUAL BACKGROUND

This family came to the attention of respondent Department of Children and Family Services (DCFS) in early June 2012, after DCFS received a referral alleging that Jose P. (Jose) and J.M. (mother) engaged in violent physical altercations in the presence of the respondent children, H.R., A.R. and K.P., (then ages 10 years, 4 years and 17 months, respectively).[1] The referral also alleged alcohol abuse by Jose, and that he physically abused A.R. and K.P. Neighbors had seen Jose in the home breaking and throwing objects, said Jose regularly drank on weekends and hit mother while under the influence. They had seen mother crying several times and observed bruises on her arms. The incident that prompted the DCFS referral occurred on June 7, 2012,[2] after Jose came home and began hitting the windows trying to get inside the house. He finally entered through a window, after which he hit mother and took K.P. and left. Mother came out of the house crying, saying Jose had run off with the baby.

Thereafter, a DCFS social worker (Miller), met with mother, Jose and each of the two girls (K.P was too young to be interviewed). Mother and Jose each denied that any domestic violence had occurred between them, that Jose had abducted K.P., that Jose had

---

[1] Jose is the father of K.P. Jimmy R. (Jimmy) is the father of H.R. and A.R. Neither is a party to this appeal.

[2] All undesignated date references are to 2012.

2

a drinking problem or that there was any abuse or neglect in their home. Mother claimed the neighbors had confused her with another relative who lived in the same apartment complex where domestic violence occurred. When four-year-old A.R. was asked about the June 7 incident, she told Miller, "don't say anything." Asked what it was that she not supposed to talk about, A.R. simply repeated the statement. A.R. said mother had told her the social worker was coming over to speak to her, but denied that mother told A.R. not to say "anything." A.R. denied any abuse or neglect.

Miller interviewed H.R. at school. H.R. told the social worker that when Jose came home the night before, mother blocked the door with a couch to keep him out. Jose broke in through a window screen. H.R. had been in her room. She heard Jose hit mother. K.P. was with mother and Jose at the time of the incident; mother was crying "a lot." H.R. said Jose was drunk, as he often was, and that he got "crazy" when he was drunk. She saw him throw his clothes out the window, grab mother by the hair and take K.P. and run down the street. H.R. had seen one other incident of domestic violence during which Jose pulled mother's hair and slapped her face. Jose once grabbed H.R. by the shirt. H.R. had seen Jose hit A.R. and K.P. on the buttocks with a sandal. H.R. was not allowed to see her father, Jimmy, because of a restraining order.

The same social worker re-interviewed H.R. at home later the same day. As soon as Miller entered the room. H.R. said, "I think I told you the wrong thing because I thought at school that you were talking about my dad, not [K.P.'s] dad because my dad used to hit my mom a lot but I got confused. Nothing happened last night." After Miller reminded H.R. that she had been very specific about whom she had spoken, and that they had talked about both Jose and her biological father, H.R. began to cry and whispered, "'I'm scared. My friend got taken away and she does not get to see her mother.'" Miller told H.R. she needed to be truthful. She asked H.R. if she had told the truth at school and H.R. nodded, "yes." H.R. denied that mother told her to lie.

A few days later, at a team decision making meeting, H.R. reconfirmed her initial statements. In mid-July, she changed her story again and told a second social worker (Maldonado) she had lied when she told Miller that Jose hit mother because she was mad

3

that Jose refused to buy her some shoes she wanted, had been confused and that first social worker pressured and tried to bribe her. H.R. also said she had lied to Miller when she said Jose struck A.R. and K.P. with a sandal. H.R. said she was sad and that all three children wanted to return to mother's care. She denied being afraid either of Jose or Jimmy. H.R. then began to cry hysterically, and refused to say more.

Maldonado also re-interviewed A.R. The child told her that Jose was not coming because he was in jail, then said, "'He did nothing . . . . He not fighting[,]'" and had not hit mother. When asked why she thought her sister had said that Jose had hit mother, A.R. said, "'She's weird . . . she's dumb cuz they don't fight.'" A.R. was asked if mother told her to deny the domestic violence allegations. She smiled and said, "'No,'" then, suddenly said, "'My mom said don't tell that [Jose] fight . . . .'" A.R. then tightly placed her hands over her mouth and said, "'He no hit her!'" and began to laugh, covered her ears and looked away, smiling. A.R. shook her head when asked if she had ever seen Jose hit, push or slap mother.

On June 26, DCFS filed a petition pursuant to Welfare and Institutions Code section 300.[3] As later sustained, the petition alleged that on June 7, and other occasions, Mother and Jose engaged in violent altercations in the children's presence, and mother failed to protect the children (count b-1; § 300, subd. (b)); Jose physically abused A.R. and K.P. (counts a-2 and b-2; § 300, subds. (a), (b)); and Jose had a history of substance abuse, was a current abuser of alcohol, and mother failed to protect the children (count b-3; § 300, subd. (b)).

At the detention hearing, held on June 26, the juvenile court found that Jose was the presumed father of K.P. and Jimmy was the presumed father of H.R. and A.R. Attorney Josephanie Ackman was appointed to represent all three children. Jimmy, who appeared at the hearing, was non-offending under the petition, but there was a restraining

---

[3] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

order against him that was in effect until 2015. Counsel was appointed for mother and Jimmy. Jose, then in custody, did not appear. The children were ordered detained and placed in the care of a paternal aunt.

On July 25 the matter was continued for mediation and set for adjudication. Mother continued to deny the allegations of domestic violence and physical or alcohol abuse in the home. Information submitted for the jurisdictional hearing by DCFS included details from a 2009 police report regarding an incident of domestic violence between Jose and a former girlfriend in which Jose had allegedly threatened to kill the girlfriend. Jose denied the allegation, or that he had been the aggressor. DCFS reported that it had information from a "reliable source," who wished to remain anonymous, that H.R. had disclosed that Jose had engaged in domestic violence and physical abuse, and that mother had screamed at and scolded H.R. during visits, blaming her for initial statements to DCFS about domestic violence.

A DCFS report for an August 30 mediation hearing contained an interview with Jimmy, who said he had not seen his daughters for five years. H.R. told Jimmy that Jose hit her and A.R. Mother denied the allegation when Jimmy asked her about it. When A.R. was one or two years old, Jimmy had seen a mark on her leg that looked as though it had been caused by a cable. When Jimmy asked mother about it, she told him it was none of his business. H.R. had often told Jimmy that Jose hit A.R. Jimmy told Jose not to touch his daughters. Jose had been "very drunk" many times when Jimmy went to pick his daughters up for weekend visits. Jimmy said the girls wanted to live with him. DCFS did not believe such a placement was appropriate given the restraining order. DCFS did recommend unmonitored visits for Jimmy, contingent upon his enrollment in a year-long domestic violence program.

Jose was deported to Mexico after his incarceration. He planned to return but, because of finances, did not know when he could.

DCFS recommended that the children not be placed with mother. Mother had scolded H.R. during visits for disclosing the domestic violence and physical abuse by Jose. DCFS opined that, by engaging in such conduct, mother showed a lack of insight

5

into the negative effects emotional and physical abuse has on children. DCFS was also concerned she might reunite with Jose if he returned from Mexico.

When the adjudication began on September 12, Ackman requested that mother's visits with the children take place in a therapeutic setting. Ackman informed the court that, according to her investigator, "The children are very afraid of, what they call, their ugly nasty mom. [H.R.] has very low self-esteem image. She does not want to go home to her mother. She wants to be with her father." Ackman said the investigator asked that visitation be stopped altogether. Mother's counsel objected to the request and said the visits had gone well. The court ordered that visitation occur at DCFS's offices to permit a social worker to assess the quality of mother's visits, and continued the hearing to October 5. Mother's counsel requested that A.R. be present for the next hearing, but the court noted that she was very young. The court did not order any of the children into court, but placed them on call. The court ordered a supplemental report with interviews with the children regarding visitation.

H.R. and A.R. were interviewed again by Maldonado on September 26. H.R. told the social worker she had lied to her before at mother's direction, "'But now, I'm going to tell the truth because I know my mom can't hit me anymore.'" H.R. said that Jose had hit her, A.R. and mother, and that mother had told both her and A.R. to lie to DCFS and say that Jose does not hit her because she could go to jail. H.R. also said that mother had told her to lie about being hit by Jimmy, and that mother would hit her if she refused to do so. Jimmy had been nice to the whole family, but Jose hit the children and hit A.R. and K.P. with a belt and a sandal. H.R. wanted to live with Jimmy. She did not want to live with mother because she knew that mother was gathering money to help bring Jose back to the United States, and if she lived with mother, Jose would hit the children.

A.R. refused to meet with Maldonado alone, and insisted that H.R. be present. A.R. began by saying she enjoyed visiting mother, but that H.R. did not and she did not know why. A.R. said mother did not scream at the children during visits. After being prompted by H.R. to "'tell the truth now . . . mom is not going to hit you if you tell the truth now . . . .'" A.R. "suddenly burst out quickly," saying Jose had hit her many times

6

with a sandal and a belt, and had also hit her brother and sister with a belt. A.R. said, "'I don't know if he hit my mom; I didn't see[,] so I don't know, ok?'" A.R. then looked at H.R. who again prompted her to "'tell the truth.'" A.R. then "blurted out" that Jose had slapped mother once, and that they fought all the time. When A.R. said she had not actually seen Jose hit mother the day he came in through a window, H.R. interrupted, saying, "'[h]e slammed my mom and we both saw it.'" A.R. denied that mother told her to lie, while looking at H.R. and gesturing for H.R. to remain quiet by putting her finger to her lips. She said she wanted to live with Jimmy and also with mother. She thought Jimmy had hit mother but had never seen him do it.

In connection with the October 9 adjudication, DCFS reported that mother had been attending court-ordered parenting classes, individual counseling and a program for victims of domestic violence. Mother had participated in sessions and been cooperative. However, mother's manipulative behavior during visits (as disclosed by H.R.) and, according to the instructor in her parenting course, her failure to "'accept[] responsibility for her abusive behavior,'" showed she had not absorbed much from the courses or counseling. The social worker recommended that the children remain suitably placed. Also, given H.R.'s denial that Jimmy had engaged in domestic violence, DCFS was in the process of assessing him for possible placement.

At the hearing, the court admitted into evidence DCFS's reports and addenda. No witnesses were called to testify. During closing arguments, Ackman stated, "My clients, through my investigation and as echoed in the report of 10/5, are manipulated by their mother, which was the cause for the recantation. . . . They are afraid of their mother. They would not be in agreement to go home with their mother at this time. They've been told that if they tell on their mom, their mom will go to jail . . . ." Ackman requested that the children remain suitably placed.

At the conclusion of the hearing, the court found mother and Jose had "been less than candid . . ." and clearly "were not credible," and sustained the petition. Proceeding to disposition, the court found that mother had intimidated the children and told them to lie. For that reason, and because of H.R.'s concern that Jose would return to the family's

7

home after his deportation, the court removed the children from the physical custody of mother and Jose. Reunification services were ordered for all parents. Mother was given monitored visits, and Jimmy was given unmonitored visits once the restraining order was modified. Mother filed this timely appeal.

DCFS subsequently filed a motion to take additional evidence[4] and request for judicial notice of postjudgment orders, and a motion to dismiss the appeal.

## DISCUSSION

Mother challenges the juvenile court's jurisdictional findings and dispositional order removing the children from her custody and restricting her to monitored visitation. Mother does not argue that the findings or order are not supported by substantial evidence. Rather, she argues they should be reversed because the children's trial counsel had a conflict of interest in representing all the children when H.R. and A.R. gave differing statements and took different positions on material matters. She also maintains that Ackman's representation of A.R. was ineffective because Ackman did not "independently represent her interests."

DCFS has moved to dismiss mother's appeal on the grounds that (1) she lacks standing to raise issues regarding Ackman's representation of all three children, (2) the appeal is moot, given that K.P. has been returned to mother's custody, A.R. is in the shared custody of mother and Jimmy, and H.R. has unmonitored visits with mother, and (3) mother forfeited the issues by not raising them in the juvenile court and by failing to file a petition for writ of habeas corpus.

---

[4] DCFS seeks judicial notice of the following postjudgment evidence: December 4, 2012 minute order; April 9, 2013 minute order; May 23, 2013 last minute information; June 14, 2013 supplemental report; and June 14, 2013 minute order. This evidence is relevant to the issue of whether the appeal has been rendered wholly or partially moot. (Evid. Code, §§ 452, subd. (d), 459, subd. (a); *In re Josiah Z.* (2005) 36 Cal.4th 664, 676; *In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315–1316.) The request for judicial notice is granted.

8

*1. Mother has standing to prosecute this appeal*

DCFS asserts that mother lacks standing to challenge the juvenile court orders as to A.R. because her interests and those of A.R. were not sufficiently interwoven such that A.R.'s lack of independent counsel affected mother's interests. DCFS is mistaken.

Relying on *In re S.A.* (2010) 182 Cal.App.4th 1128, DCFS contends that mother lacks standing because A.R.'s right to competent counsel is personal to A.R., whose interests purportedly are not interwoven with mother's. (*Id*. at pp. 1133–1134.) *In re S.A.* involved a child sexually abused by appellant, a maternal relative, who sought to admit evidence from the child's therapist that the child had never claimed that the appellant had abused her and that the therapist did not believe the child was sexually abused. (*Id*. at pp. 1132–1133.) The court excluded the evidence based on the psychotherapist-patient privilege. (*Id*. at p. 1133.)

On appeal, appellant argued the child received ineffective assistance of counsel because her attorney failed to interview the child's therapist and, had he done so, he would have learned that the therapist disbelieved the child's accusation of sexual abuse against appellant. (*In re S.A.*, *supra*, 182 Cal.App.4th at pp. 1133–1134.) The court found appellant lacked standing to raise the issue of the competence of the child's counsel, and that his interests and the child's were not intertwined. (*Id*. at p. 1134.) The appellant had relinquished his right to reunification with the child and potential custody of her, and any harm to his reputation (e.g., falsely being labeled a child molester) was insufficient to confer standing. (*Id*. at pp. 1134–1135.)

An issue that does not affect the parent's own rights may not be raised on appeal. (See *In re Devin M*. (197) 58 Cal.App.4th 1538, 1541.) Parents have a fundamental interest in the companionship, care, custody, and management of their children. (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 223.) That interest manifests in reunification with the child or in maintaining the parent-child relationship. (*In re Devin M*., at p. 1541.) Children have both a compelling interest in being a part of their natural family, and in being free from abuse and neglect. (*In re Dakota H*., at p. 223.)

This case is unlike *In re S.A.*, *supra*, 182 Cal.App.4th 1128. Here, mother and A.R. had at least one interwoven interest: a mutual interest in reunification. "At stake in a dependency proceeding is both the child's welfare and the parent-child relationship. [Citation.] The two considerations are intertwined." (*In re Patricia E.* (1985) 174 Cal.App.3d 1, 6, disapproved on other grounds by *In re Celine R.* (2003) 31 Cal.4th 45, 60; see also *In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1377–1378.) Where the parties' interests are intertwined, either may litigate issues that impact their related interests. (*In re Patricia E.*, at p. 6.) A parent may challenge a child's right to independent counsel at any phase of the dependency proceeding, so long as the issue litigated impacts the parent's interest in the parent-child relationship. (*Id.* at pp. 4–7.)

In this case, H.R. and A.R. each demonstrated some reluctance to disclose domestic violence and abuse, and a desire to be in mother's custody at least part time, as long as Jose was out of the home. Early on, H.R. told the first social worker with whom she spoke that she was afraid to speak about the physical abuse and domestic violence because her friend had been "taken away" from her own mother. A.R. often told DCFS that she wanted to return to mother's custody or Jimmy's, and that she liked visits with mother. Thus, while the children had an interest in being free from abuse or neglect, they also shared with mother an interest in family reunification. Mother's interest in the parent-child relationship is also impacted by the manner in which the children's interests are represented especially where, as here, H.R. and A.R. at times expressed conflicting desires and/or contradictory accounts. Mother's interest in A.R.'s representation is interwoven with the child's interest in reunification. (*In re Patricia E.*, *supra*, 174 Cal.App.3d at p. 6.) Mother's standing to appeal is clear.

2. *Not all the issues raised on appeal are moot*

Based on events occurring after the dispositional order, DCFS maintains that mother's appeal has become moot. This assertion is partially correct.

On appeal, mother contends, among other things, that the juvenile court erred when it removed K.P. from her custody and when it restricted her to monitored visitation with her children. Those issues have been rendered moot. "An appeal becomes moot

10

when, through no fault of the respondent, the occurrence of an event renders it impossible for the appellate court to grant the appellant effective relief." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1404.) K.P. was returned to mother's custody in February 2013 and, since May 2013, mother has had unmonitored visitation with all three children. No further relief is available as to these matters. The issue of whether A.R. should be returned to mother's custody also has been rendered moot; as of mid-June 2013, she has been in the shared custody of mother and Jimmy. While H.R. has not been returned to her custody, mother also does not argue that the dispositional order lacks substantial evidence.

Still, the appeal is not wholly moot. First, mother argues that the juvenile court erred in failing to heed red flags raised by the October 5 social worker's report in which H.R. and A.R. expressed conflicting desires about the material issue of their placement, and gave contradictory accounts about mother's conduct. She insists that, at that point, further investigation was necessary and, if the girls continued to express conflicting desires or contradictory views, separate counsel should have been appointed for them.

Mother argues that the juvenile court would not have made the jurisdictional findings or dispositional order it made, but for Ackman's conflicted and ineffective representation. An issue will not be deemed moot where "the purported error infects the outcome of the subsequent proceedings." (*In re Dylan T.* (1998) 65 Cal.App.4th 765, 769.) Nor will an issue be "rendered moot by subsequent events if the question to be decided is of continuing public importance and is a question capable of repetition yet evading review." (*In re Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1404.) The issue of conflicted or effective representation of multiple siblings in a dependency proceeding by a single attorney is a matter of ongoing public importance. (See Cal. Rules of Court, rule 5.660(c)(2)(B)(vi), (vii).) For these reasons, the appeal is not wholly moot.

3.      *Mother forfeited her challenge to the children's joint representation*

"[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) Dependency cases are not exempt from the forfeiture rule. (*Ibid.*;

11

*In re Wilford J*. (2005) 131 Cal.App.4th 742, 754.)  The purpose of the rule is to encourage parties to bring the error to the juvenile court's attention so that it may be corrected.  (*In re S.B*., at p. 1293.)  "[A]pplication of the forfeiture rule is not automatic." (*Ibid*.)  But, in dependency cases, the discretion must be exercised with special care. Because these cases involve the well-being of children, in which considerations such as permanency and stability of placement are of paramount importance, a reviewing "court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue."  (*Ibid.* [forfeited issue involved interpretation of a statute and which had divided courts of appeal]; see also *In re M.R*. (2005) 132 Cal.App.4th 269, 272 [forfeiture was excused in order to clarify recent statutory amendment].)  This is not the rare case involving the type of legal issue that compels overlooking the forfeiture.

Here mother, who was represented by counsel in the trial proceedings, implicitly concedes that her counsel raised no objection to the joint representation.[5]  This, despite the fact that divergence in the girls' intermittently differing factual accounts, and expressed desires for visitation or to return to mother's custody were apparent from the outset.  Mother could have brought this issue of a potential conflict of interest to the juvenile court's attention, but did not.  She has not articulated any legal justification to excuse her failure to raise these issues below.  She may not raise for the first time on appeal an issue she could have raised below.  "'A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.]  Forfeiture . . . applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings. [Citations.]'"  (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 686; see also *In re Dennis H.* (2001) 88 Cal.App.4th 94, 98 ["The most obvious types of implied waiver arise from failure to object to the ruling or proceeding"].)  Mother's challenge to the order of joint representation and of ineffective assistance of counsel has been forfeited.

---

[5] Mother raises no issue as to the effectiveness of her own trial counsel.

*4.     Mother's failure to assert her claim of ineffectiveness of counsel by way of petition*
*for writ of habeas corpus prevents review*

As a correlative to her objection to joint representation, mother maintains that Ackman provided A.R. ineffective counsel because she failed to meet with A.R. and communicated only H.R.'s views to the juvenile court.  She argues that separate attorneys were necessary to determine what, from each girl's perspective, was true as to whether mother intimidated them into lying about or recanting allegations of domestic violence or physical abuse in the home.  "[T]he proper way to raise a claim of ineffective assistance of counsel is by writ of habeas corpus, not appeal.  [Citations.] . . . [A]n ineffective assistance claim may be reviewed on direct appeal [only] where 'there simply could be no satisfactory explanation' for trial counsel's action or inaction.  [Citation.]"  (*In re Dennis H.*, *supra*, 88 Cal.App.4th at p. 98, fn. 1; *In re Paul W.* (2007) 151 Cal.App.4th 37, 53.)  That is because, "establishment of ineffective assistance of counsel most commonly requires a presentation which goes beyond the record . . . ."  (*In re Arturo A.* (1992) 8 Cal.App.4th 229, 243.)  Evidence of the reasons for trial counsel's tactics, as well as his or her communications with the client, or lack thereof, are matters typically outside the record which must be presented by declarations or other evidence filed with a writ petition.  Where, as here, the parent fails to file a habeas petition, our review is limited to the appellate record.  (*Ibid*.)  This record does not establish that A.R. received ineffective assistance of counsel.

Mother argues the record fails to show that Ackman met with A.R., interviewed her or considered her wishes or opinions.  She maintains she did not have to raise her ineffective assistance of counsel claim by way of a petition for writ of habeas corpus because "there can be no reasonable explanation for ignoring [A.R.'s] views and interests."  But, the record contains no affirmative evidence to prove that Ackman did not in fact meet with A.R., that she failed to listen to her client, or that she ignored A.R.'s views and interests.  Mother's assertion that Ackman ignored A.R. and provided her ineffective representation is nothing more than speculation based on the way Ackman chose to present her clients' case.  First, the fact that Ackman said she spoke with H.R.

13

does not mean she did not also talk to A.R. simply because she used referred to a singular "client" on September 12, 2012.[6] Further, Ackman informed the court that recommendations made by her investigator were based on reports from both H.R. and A.R.

It is also the case that both girls intermittently admitted and denied abuse in this action. Thus, it is incorrect for mother to claim that Ackman "ignored" A.R.'s viewpoint. The juvenile court was aware of this variance, as well as A.R.'s occasionally inconsistent wishes, factual statements and opinions all of which are reflected in the DCFS reports it read. Mother's characterization of A.R.'s statements to DCFS as reported in the October 5 report is incomplete. A.R. did, at one point say she wanted to live with mother. But, prior to that, the child described the domestic violence incident on June 7 during which she said she was afraid. Further, mother ignores the fact that, during the September 26 interview, A.R. engaged in behavior indicating that statements she made that were favorable to mother may not have been truthful; i.e., when she behaved oddly and gestured to H.R. to be quiet. Further, at the outset of the October 9 hearing, Ackman advised the juvenile court that the children denied the petition's allegations, but said she was required by section 317 to advocate that the petition be sustained.

Absent evidence to the contrary, we assume that Ackman properly performed her duties under section 317, subdivision (e). (Evid. Code, § 664; *In re Barbara R.* (2006) 137 Ca1.App.4th 941, 954.) As appellant, it is mother's duty to affirmatively show error on the record. (*Calhoun v. Hildebrandt* (1964) 230 Cal.App.2d 70, 72.) There is no showing on this record that the siblings' attorney violated her duty or that the court

---

[6] Indeed, Ackman was duty-bound to do so. Pursuant to section 317, subd. (e)(2), if an attorney represents a child who is "four years of age or older, counsel shall interview the child to determine the child's wishes and assess the child's well-being, and shall advise the court of the child's wishes. Counsel shall not advocate for the return of the child if, to the best of his or her knowledge, return of the child conflicts with the protection and safety of the child." There being no evidence to the contrary, we presume counsel performed her professional responsibilities.

14

should have found an actual conflict existed. Absent such a factual showing, there is no merit to mother's claim that the children's attorney was ineffective.

5. *Mother's appeal would also fail on the merits*

Assuming mother had not forfeited her appellate challenge, her arguments would fail on the merits. Section 317, subdivision (c) permits an attorney to represent a group of siblings who are the subject of a dependency action. However, the appointed attorney has "an ongoing duty to evaluate the interests of each sibling to assess whether there is an actual conflict of interest." (Cal. Rules of Court, rule 5.660(c)(2)(A).) A conflict of interest, as used in section 317, subdivision (c), means an actual—not a potential— conflict of interest. (*In re Celine R.*, *supra*, 31 Cal.4th at pp. 56–57 [after initial appointment court must relieve attorney from multiple representation only if actual conflict arises].) Separate counsel are required when an actual conflict exists or there is a reasonable likelihood an actual conflict will arise. (*Id*. at p. 58.) The failure to comport with this rule is subject to a harmless error analysis. (*Id*. at p. 59.) An actual conflict exists when the siblings' interests conflict and the conflicting desires or contradictory accounts of events require their attorney to take action to serve the best interests of one client, but the attorney can't do so without violating a duty owed to a sibling, or the attorney is prevented from independently evaluating the best interests of each minor client. (*In re Zamer G*. (2007) 153 Cal.App.4th 1253, 1267.)

Courts recognize that the conflicting preferences of minor clients do not necessarily give rise to a disqualifying conflict, as it is the attorney's responsibility to make a reasonable, independent determination of the minors' best interests, notwithstanding the minors' preferences. (*In re Zamer G.*, *supra*, 153 Cal.App.4th at pp. 1270–1271.) Nor is it the case that a child's attorney need withdraw simply because she does not believe her client's account of events or disagrees with what the child thinks is in his or her best interests. (*In re Kristen B.* (2008) 163 Cal.App.4th 1535, 1541– 1542.) In *Kristen B.*, the child's attorney questioned her client in a way that showed she disbelieved her recantation of previously consistent disclosures of sexual abuse by her stepfather. (*Id*. at pp. 1539–1540.) The attorney acknowledged the recantation, but

15

argued that return to parental custody would expose her client to a substantial risk of sexual abuse; the court agreed. (*Id.* at p. 1540.)

On appeal, the mother argued the child received ineffective assistance of counsel because a conflict arose once the attorney disagreed with the child's stated wish to return home, and her duty of loyalty prohibited her from challenging her client's testimony. (*In re Kristen B.*, *supra*, 163 Cal.App.4th at p. 1540.) The appellate court disagreed. It found that, "counsel performed her duties under section 317 zealously and effectively by conducting a factual investigation and advocating a position, supported by the evidence, which served to protect Kristen's welfare. [Citation.] She clearly informed the court of the conflict between Kristen's stated interest and what she believed was in Kristen's best interests. The record provides no basis whatsoever to conclude Kristen received ineffective assistance of counsel when minor's counsel advocated a position she believed was in Kristen's best interests, notwithstanding Kristen's stated wishes. [Citation.]" (*Id.* at p. 1542.)[7]

*In re Zamer G.*, *supra*, 153 Cal.App.4th 1253, on which mother relies, is inapposite. There, the appellate court affirmed "the juvenile court's order disqualifying [minors' counsel] from representing four of the siblings because the record contain[ed] substantial evidence of an actual conflict among those four siblings" (*id.* at p. 1257), viewing the circumstances most favorably to the trial court's order. (*Id.* at p. 1271.) The disqualified attorney had "received confidential information" from two of the siblings.

---

[7] Here, the children's interests were aligned: both needed protection from domestic violence in the home, physical abuse by Jose and emotional abuse by mother. The position Ackman advocated was supported by the evidence and served to protect both girls' welfare. She did not have to believe the statements by A.R. that conflicted with her sister's and supported mother's in order to conduct a factual investigation and effectively represent A.R.'s interests. (*In re Kristen B.*, *supra*, 163 Cal.App.4th at p. 1542.) Ackman had ample reason to question the reliability of A.R.'s representations. Nevertheless, the children's interests were aligned, and the record is devoid of any indication that Ackman's advocacy on behalf of H.R. violated a duty owed to A.R. or that she failed to independently evaluate each child's best interests.

16

(*Id*. at p. 1261.) "To advocate in favor of reunification services for [the other two siblings, counsel] would have to dispute the accuracy or reliability of the statements made by" the siblings from whom counsel had received confidential information. (*Id*. at p. 1272.) The court stated the "juvenile court could reasonably conclude that there was an actual conflict because [counsel] could not professionally and independently evaluate each child's best interests when faced with this dilemma." (*Ibid*., italics omitted.) Here it is speculative and unlikely that either child made significant confidential disclosures to Ackman. Further, both girls were placed on call to testify at the adjudication hearing; the fact that mother did not call either one to testify suggests that neither one's testimony was critical.

Further, mother has not shown how Ackman's joint representation prejudiced her. Separate counsel for A.R. would still be bound by section 317, subdivisions (c) and (e)(2), to advocate in a manner that protected A.R. and to advance her best interests, not just her stated wishes. A parent claiming ineffective assistance of counsel "'must demonstrate both that: (1) his appointed counsel failed to act in a manner expected of reasonably competent attorneys acting as diligent advocates; and that (2) this failure made a determinative difference in the outcome, rendering the proceedings fundamentally unfair in that it is reasonably probable that but for such failure, a determination more favorable for [the parent's] interests would have resulted.' [Citations.]" (*In re Dennis H.*, *supra*, 88 Ca1.App.4th at p. 98.)

There is no reason here to expect that there would have been any different placement order. The juvenile court makes credibility determinations and resolves factual conflicts. (*In re Daniel G*. (2004) 120 Cal.App.4th 824, 830.) Here, the court was convinced by the police report that domestic violence had occurred and that neither mother or Jose was credible. It also found mother had coached the girls and intimidated them so they would lie. It does not matter that mother disagrees with that conclusion. Her effort to have this Court reject that finding and reweigh the evidence is unavailing. (*In re Casey D*. (1999) 70 Cal.App.4th 38, 52–53.)

17

On this record, there is no reasonable probability that mother would have received a more favorable outcome had A.R. been represented by separate counsel. The duty of an attorney representing A.R. alone would be to advocate for A.R.'s best interests, even if they conflicted with her wishes. (*In re Kristen B.*, *supra*, 163 Cal.App.4th at pp. 1541–1542.) We have no reason to believe another attorney would have sought a different result here.

Finally, we observe again that, for good reason, mother does not argue that there is insufficient evidence to support the court's jurisdictional findings or dispositional order. The juvenile court found that mother's and Jose's denials of domestic violence, physical abuse by Jose and alcohol abuse by Jose were not credible. Setting aside the intermittently contradictory statements by the girls, the court had sufficient evidence to sustain the petition and support the dispositional orders. First, there was the statement by the manager of the apartment complex, who said she had been called before about possible domestic violence between mother and Jose. There was also a 2009 police report detailing Jose's physically abusive behavior toward his then-girlfriend, and his threat to kill her, and statements by Jimmy who said Jose would hit H.R. and A.R. When Jimmy had confronted mother about a mark on A.R.'s leg, and his concern that Jose, whom he had often observed to be "'very drunk,'" was physically abusing her, mother told him it was "'not [his] business'" to know how she had been hurt. And, finally, DCFS had information from a witness it found "reliable" that mother scolded H.R. during visits and blamed her for disclosing domestic violence. This constitutes sufficient evidence to support the jurisdictional findings. Mother's inappropriate behavior toward H.R. for disclosing abuse, coupled with information that mother refused to accept responsibility for her role in that abuse, constitutes substantial evidence to support the disposition order.

18

**DISPOSITION**

The appeal is dismissed.

NOT TO BE PUBLISHED.


                                            JOHNSON, J.


We concur:


   CHANEY, Acting P. J.


   MILLER, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.